WILLIAM ROBOTHAM and JOHN ILLINGWORTH

*v.*

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, THE
FIDELITY TRUST COMPANY et al.

[Filed February 20th, 1903.]

1. The Prudential Insurance Company, existing under special charter
(*P. L. of 1873 p. 1419 § 8*), is within the operation of *P. L. of 1896 p.
129*, substantially re-enacted by *P. L. of 1902 p. 415*, enumerating the in-
vestments which "any insurance company existing by virtue of the laws
of this state, created by special charter or otherwise," may make.

2. *P. L. of 1896 p. 129*, substantially re-enacted by *P. L. of 1902 p. 415*,
providing that insurance companies shall not purchase stock of any com-
pany "which has not regularly paid dividends for the five years preceding
the time of such purchase," does not limit such companies to the purchase
of stock which has paid dividends for the five years preceding, but to
the purchase of stock of a company which has paid dividends during such
period of time.

3. Such statute does not permit such companies to subscribe for new
stock of other corporations, but confines their investments to such stock
or obligations as may be bought on the market, commonly known as
"investment securities."

4. An expenditure by the directors of an insurance company of over
$8,000,000 in order to acquire a majority of the stock of a trust company
by paying for such stock at more than twice its book value, the income
of which, from the present rate of dividends, will be less than two per
cent. per annum, to carry out a scheme of corporate control which they
deem advantageous to the company, cannot be considered an investment,
within the meaning of *P. L. of 1896 p. 129*, substantially re-enacted by
*P. L. of 1902 p. 415*, which provides that an insurance company, "for the
purpose of investing" its funds, may purchase and hold, as collateral
security or otherwise, the stock of certain other corporations.

5. The mere fact that an insurance company, having power to invest
its funds in the stock of other corporations, would, by the purchase of
certain stock of another corporation, acquire a controlling interest
therein, would not make such acquisition unlawful if made in good faith
for the purpose of an investment.

6. Section 51 of the Corporation act, as revised in 1896, provides that
any corporation may purchase shares of stock and evidences of indebted-
ness of any other corporation. Section 2 provides that every corporation
shall possess the powers contained in the act, "so far as the same are

43

necessary or convenient to the attainment of the objects set forth" in its character.—*Held*, that section 51 did not repeal the limitations on the power of an insurance company as to the investment of its funds contained in its charter and *P. L. of 1896 p. 129*, relating to insurance companies "created by special charter or otherwise;" it having been the continuous policy of the legislature to treat the subject of the investment of the funds of insurance companies in a distinct and special statute, as evidenced by the substantial re-enactment in 1902 (*P. L. of 1902 p. 415*) of *P. L. of 1896 p. 129*, as set forth above.

7. A plan by the directors of an insurance company to exchange majority holdings of stock with a trust company, involving an expenditure of over $8,000,000, in order that they and those whom they select from time to time may forever dominate the appointment of the directors of each corporation is, as a whole, *ultra vires*.

8. The establishment of such a syndicate for perpetual control would be a direct intentional injury to minority stockholders of the insurance company, as it would sever the beneficial interest from the voting power of their stock, and injure its market value by stripping from it all value derived from its voting power.

9. The fact that such scheme might prove abortive and give dissenting stockholders the right to maintain a suit in equity for redress, is no reason for withholding an injunction on their behalf to prevent its consummation.

10. The presence of a director or directors on both sides of a transaction between two corporations does not give a dissenting stockholder an arbitrary right to an injunction, but may give him a most ample right to subject the transaction to the scrutiny of the court and may cast on the corporations or directors concerned the burden of disclosing and justifying the transaction.

11. Where a proposed scheme by the directors of an insurance company for an exchange of corporate control with a trust company would forever secure to them and their chosen successors great emoluments and great influence and power, they were disqualified from adjudicating finally that the scheme would be advantageous to their corporation.

12. In an action by dissenting stockholders to enjoin such scheme, the directors had the burden of proving to the court that it would be advantageous.

On motion for injunction on order to show cause. Heard on bill, affidavits and answering affidavits.

The bill is filed by the complainants as stockholders of the Prudential Insurance Company of America, hereinafter termed the Prudential company, on behalf of themselves and all other stockholders who may come into the suit, and it sets forth the following case:

The Prudential company is a corporation under the laws of New Jersey, located in the city of Newark, originally incorporated under the name of the Widows' and Orphans' Friendly Society by a special act, approved April 3d, 1873. The objects and purposes stated in the act were

"to assist sick, needy or disabled members, to aid in defraying the funeral expenses of deceased members and to provide for the wants of widows and families of members after death."

By a supplement to the charter, approved February 18th, 1875, the corporation was granted the power

"to receive deposits of money or other valuables upon such terms as may be agreed upon, or to make contracts with its members for the purchase and erection of dwellings, and to provide a fund to be paid either before or after death for such purposes and in such manner as may be designated by its members."

The capital stock was originally fixed at $25,000, with the privilege of increasing it to $100,000, and each share, which is of the par value of $50, is made personal property. In pursuance of appropriate legislation, the name of the corporation was changed twice, the last change being to the form above stated, and the number of the directors was left to be prescribed by the by-laws, such number, however, not to be less than nine. The number has been fixed at fourteen. The directors are to hold for one year from election and until their successors are chosen. The stock of the company was, pursuant to law, from time to time, increased. The last increase was effected on January 6th, 1893, and made the capital $2,000,000. The original charter provides that

"each stockholder shall be entitled to one vote for each share of stock by him held and every member of the corporation, though not a stockholder, shall be entitled to one vote,"

and further provides (section 10) that

"all persons making contracts with said corporation for any of its objects or purposes, shall become and be members of said corporation, subject, however, to all lawful by-laws, rules and regulations which may be made or prescribed by said directors."

The directors are given

"full power to make by-laws, rules and regulations not inconsistent with the constitution and laws of the United States or of the state of New Jersey."

By act of March 3d, 1880 (*P. L. of 1880 p. 84; Gen. Stat. p. 1757 § 81*), the policy-holders of the Prudential company were deprived of the right to vote for directors. The applicability of this act to the Prudential company and its validity as against these complainants has not been questioned—has in fact been conceded by all parties in this case.

Under the provisions above cited the company embarked in a life insurance business which seems to be admitted to be its only business at the present time, if, indeed, it ever actually engaged in any other. It is not questioned that the corporate objects of the Prudential company involve gain to the stockholders, and, in fact, large dividends have been made to the stockholders out of profits for a number of years.

The complainant Robotham is the owner in his own right of six hundred shares of the capital stock of the Prudential company, and has been a stockholder continuously since November, 1875. The complainant Illingworth is the owner in his own right of three hundred shares of stock, which he has owned continuously for three or four years last past. The par value of these nine hundred shares is $45,000, but the market value is about $350,000.

The defendant the Fidelity Trust Company, hereinafter termed the Fidelity company, is also a corporation under the laws of New Jersey, located in the city of Newark. It does business as an ordinary bank of deposit, conducts a savings department and a department for guaranteeing titles to real estate, carries on a safe deposit business and executes trusts of various kinds, holding at present over $9,000,000 of trust funds.

The capital of the Fidelity company has, from time to time, been largely increased, until it now stands at the sum of $1,500,000. The board of directors of the Fidelity company consists at the present time of eighteen members, seven of whom are also directors of the Prudential company, and constitute, therefore, one-half of the board of the latter company.

Robotham *v.* Prudential Insurance Co.

The life insurance business of the Prudential company has rapidly increased through a series of years. The total assets of the company are now nearly $60,000,000. The total assets of the Fidelity company are now over $14,000,000, while its surplus and undivided profits amount to over $3,700,000. The transactions of both companies, in their respective lines, are of great magnitude. The policy-holders of the Prudential company number over four and a half million, and are alleged to be scattered widely throughout many states.

The business relations between the Prudential company and the Fidelity company for some time past have been intimate and apparently profitable to both companies. The Prudential company has acquired a substantial stock interest in the Fidelity company, and has also maintained large deposits with that company. The directors who have successfully managed and now control this insurance company are men of recognized ability and unquestioned integrity—men who take pride in the great institution which they have built up. While the qualification of these directors to do some of the proposed acts under investigation in this case is questioned on the ground that they are not interested, this charge is made with the concession that they are not intending to do anything which they do not honestly and sincerely believe to be advantageous to the policy-holders and stockholders of their company.

The transactions which are subjected to judicial scrutiny in this case may be outlined as follows: The capital stock of the Prudential company now consists of forty thousand shares of $50 each par value. The Prudential directors apparently hold or control a majority of these shares, and thus, in the usual way, may secure their own election from year to year, and appoint a successor when a vacancy occurs by death. There are at present ninety-one different stockholders. The president of the Prudential company, in his affidavit, states as follows:

"A considerable amount of the stock is still held in large blocks by persons who are getting well on in life, so that in the comparatively near future it will inevitably result that said stock will become far more scattered than it is at present.

"It was with these conditions in mind and with a full realization on the part of the principal stockholders of the insurance company of the

vital importance of safeguarding the interests of over four and one-half million of its policy-holders, that the stockholders of the insurance company set about the consideration of some plan that would accomplish this result, conserve the interests of the stockholders as well and put the assets of the company forever beyond the reach of reckless speculators, who, when the stock has become scattered, might acquire it even at fancy prices for the purpose of manipulating its assets, as has been the case in the past in many instances known to all insurance men.

"The plan adopted by the majority of the stockholders of the insurance company was to negotiate a sale to the Fidelity Trust Company of a controlling interest in the shares of the insurance company; that company to double its present capital of $1,500,000 and put out the new stock at $750 per share."

The president's affidavit further sets forth that

"concurrently with the plan of the trust company to acquire a controlling interest in the stock of the insurance company, the principal stockholders of the insurance company consider it highly desirable that the insurance company shall acquire a like interest in stock of the trust company, and, at our instance, the directors of the trust company have made such contracts with their stockholders that they can tender to the insurance company, at $750 per share, a sufficient number of shares of the new issue to give the insurance company, with their present holdings, such control."

There is no dispute about the general nature of any essential details of the scheme for the permanent control of the affairs of the Prudential company which its "principal stockholders" have formed and which its directors have proposed to carry into effect by the exercise of their fiduciary powers.

The Fidelity company has already entered into a written contract with stockholders of the Prudential company by which these stockholders agree to sell enough of their holdings of Prudential stock, at $600 for every $100 of par value, to give the Fidelity company one share more than one-half of the total outstanding Prudential capital stock. There is no favoritism or discrimination among the stockholders of the Prudential company with respect to this contract—each stockholder is permitted to sell one-half of his holdings at the price above stated, and those who sign agree to contribute, pro rata, enough stock to make up any shortage which may arise by reason of the failure or refusal of any of the Prudential stockholders to sign the agreement. The Fidelity company, in pursuance of the plan, having

doubled its present capital, will give the new stock to subscribers at $750 per share, thus realizing $11,250,000, which will leave the Fidelity company with a capital of $3,000,000, and a surplus of $13,000,000, and a considerable amount of undivided profits in addition. Of this new stock of the Fidelity company the Prudential directors propose to take, for their company, enough of the new shares, at $750 per share, to give their company, with its present holdings, a majority of the capital stock of the Fidelity company as the same will stand after the increase has been effected. How much Fidelity stock the Prudential company now holds is not disclosed, but the president of the Prudential company states in his affidavit that such holding is large, but less than one-third of the total amount. The acquisition of a majority of the Fidelity stock, as increased, will therefore involve the expenditure by the Prudential company of over $7,500,000. The book value of the Fidelity stock at present is a little less than $350 per share of $100 each. The result of the above agreement will be to give the Prudential company the absolute power to appoint the directors of the Fidelity company, and to give to the Fidelity company absolute power to appoint the directors of the Prudential company. Inasmuch as such an arrangement practically places the corporation whose election of directors comes first within the absolute control of the directors of the other corporation, the president of the Prudential company announces that

"the annual meetings of the two companies will be *so arranged* and other arrangements will be so made that the Prudential Company will forever be the dominant factor as, of course, it should be."

The Fidelity company, during the past year, has paid dividends to its stockholders at the rate of $16 on each $100 of par value. The Prudential company has uniformly paid annual dividends during recent years at the rate of $10 on each $100 of par value, and has never paid a higher rate of dividends during its existence, and has no present intention to increase the dividends in the future.

Although the above plan has been formed and is approved by the directors of both of these companies, the only complaint in

this case is on the part of stockholders of the Prudential company. The bill prays for discovery against both corporations, and prays that the Prudential company and its officers and directors may be enjoined, among other things, from voting in favor of the proposed increase of the capital stock of the Fidelity company, and from subscribing for or purchasing any shares of such increased capital, and that the Fidelity company may be enjoined from receiving the vote of the Prudential company in favor of said increase of stock.

The defendants consist of the two corporations and the directors of the Prudential company.

*Mr. Sherrerd Depue, Mr. John R. Hardin* and *Mr. Richard V. Lindabury,* for the complainants.

*Mr. Robert H. McCarter* and *Mr. Thomas N. McCarter,* for the Fidelity Trust Company.

*Mr. Edgar B. Ward, Mr. Charles L. Corbin* and *Mr. John W. Griggs,* for the Prudential Insurance Company.

STEVENSON, V. C.

The basis of any preliminary injunction in this case must be found in some legal or equitable right of the complainants, as stockholders of the Prudential Insurance Company, to prevent their trustees, the Prudential directors, from injuring them by a violation of fiduciary duty. The interesting scheme above set forth for the exercise of all the powers of these two great corporations by a perpetual and self-perpetuating syndicate has received the approbation of the boards of directors of both companies. But no stockholder of the Fidelity company is before this court with any complaint. In applying legal tests to the scheme as a whole and to its various parts as distinct corporate acts, we are confined to the consideration of the rights and remedies of these two dissenting stockholders of the Prudential company.

All the objections to the scheme as a whole, and to its various parts as separate transactions, are referable to one or the other of three charges, viz., (1) that the Prudential directors are

threatening to commit acts which are *ultra vires* and therefore presumed by law to be injurious to the complainants as stockholders when they make their protest against them; (2) that these directors are threatening to use the powers which they hold in trust for all the stockholders for the purpose of getting gain for themselves in which the stockholders generally will not share; (3) that even if each act which the directors propose to do in the execution of their scheme must be conceded to be *intra vires* of the corporation, and also an act which these directors are not incapacitated by self-interest from doing, still the final object which they propose to obtain by doing these various acts —the situation which, by means of these acts, they propose to create, will be injurious to the complainants and constitute a violation of their rights as stockholders.

1. As I understand the case presented by the complainants, the only separate act, apart from the scheme as a whole, which the Prudential directors are proposing to do in pursuance of their general scheme, which is claimed to be *ultra vires* of the corporation, consists of the expenditure of $8,000,000 or $10,000,000 belonging to the Prudential company for the acquisition of a sufficient number of shares of the new issue of Fidelity stock to give the Prudential company a majority of the whole capital stock of the Fidelity company as the same will stand after the proposed increase has been effected.

In my opinion the complainants' objection to this specific act, when viewed independently of the general scheme of which it is a part, is well taken. In the laws governing the investments or the expenditures of the funds of the Prudential Insurance Company I find no authority given to any board of directors, however constituted and however free from any disqualifying self-interest, to acquire this particular stock in this particular way.

The charter of the Prudential company, approved April 3d, 1875 (*P. L. of 1873 p. 1419 § 8*), makes it lawful for the corporation to purchase property under execution sales and

"to take and receive any real or personal estate in payment or towards satisfaction of any debt previously contracted and due to the said company, and to hold the same until it can be conveniently sold or converted into money."

Robotham *v.* Prudential Insurance Co.

This section concludes as follows:

"*And for the purpose of investing any part* of their capital stock, funds or money, the said company may purchase and hold, sell and convey any bonds or public stock issued or created by this state, or by the United States, or by the states of New York, Massachusetts or Connecticut, or may invest the same in bonds secured by mortgages on unencumbered real estate within this state worth double the (amount) invested or loaned."

Here we have plain and specific directions as to what property the corporation might acquire and hold in the transaction of its business, and particularly for the purpose of investing its funds.

"The charter of a corporation is the measure of its powers and the enumeration of those powers implies the exclusion of all others." *Thomas* v. *West Jersey Railroad Co., 101 U. S. 71; De la Vergne Refrigerator Co.* v. *German Savings Institution, 175 U. S. 40, 55; Rabe* v. *Dunlap, 6 Dick. Ch. Rep. 40, 45; Stockton* v. *Central Railroad Co., 5 Dick. Ch. Rep. 52, 65.*

Where the charter of an insurance company expressly gives it power to invest its funds in certain specified kinds of securities, the power to invest in other securities is excluded under the operation of the rule above mentioned. *North River Insurance Co.* v. *Lawrence, 3 Wend. 482, 483; New York Firemen's Insurance Co.* v. *Ely, 2 Cow. 678, 699, 700; People* v. *Utica Insurance Co., 15 Johns. 383, 385.*

If this were not true the provisions in many charters of insurance companies and savings banks specifying the mode in which investments may be made would have no force, inasmuch as in many instances no express prohibitions are made upon other investments.

The above-quoted provisions which at the start regulated the investment of the funds of the Prudential company were similar in their scope and effect to those laid down by the General Insurance act for the government of companies organized under it. *P. L. of 1852 p. 163 § 10; Rev. 1875 p. 512 § 32; Gen. Stat. p. 1761 § 100.*

In 1896 section 32 of the General Insurance act, above referred to, was amended so as to greatly enlarge the various classes of lawful investments which insurance companies might make, and

Robotham v. Prudential Insurance Co.

the section no longer was confined in its operation to insurance companies organized under the act, but was expressly applied "to any insurance company existing by virtue of the laws of this state created by special charter or otherwise." *P. L. of 1896 p. 129.*

The intention of the legislature to make this law operative upon the Prudential company is perfectly plain, and no question has been raised as to the power of the legislature to do this thing without the consent of the Prudential stockholders. The argument on both sides concedes at least that these complainants, as stockholders of the Prudential company, are bound by the provisions of this new statute governing the investment of the funds of insurance companies.

The provisions of this law in regard to the purchase of stock in private corporations are as follows:

"It shall be lawful for any insurance company　*　*　*　for the purpose of investing its capital surplus and other funds, or any part thereof to purchase and hold as collateral security or otherwise, and to sell and convey"

certain specified public bonds and stocks, "or to invest said capital surplus and other funds, or any part thereof," in mortgages of real estate worth double the sum invested or loaned,

"or to lend on or purchase mortgage bonds of railroad companies organized under the laws of said states or the District of Columbia, or either of them, or operated therein, or the capital stock, bonds, securities or evidences of indebtedness created by any corporation or corporations created under the laws of the United States or of this or any other state, except the stock of mining and manufacturing companies and stocks commonly known as 'industrials;' *provided*, that no loan shall be made or retained on any of the above-mentioned securities, except the bonds or stock issued or created by the United States or this state exceeding ninety per centum of the market value thereof; *and provided further*, that no purchase shall be made of stock of any company which has not regularly paid dividends for the five years preceding the time of such purchase, and that no loan shall be made by any company on its own stock."

In 1902 a new revision of the General Insurance act was passed. *P. L. of 1902 p. 407.* The law of March 24th, 1896, above referred to, with some slight changes, entirely unimportant

in respect of the questions raised in the present case, was re-enacted, and now constitutes section 16 of that act. *P. L. of 1902 p. 415.*

Under the legislation above cited the power of the Prudential company to acquire stock in other private corporations seems perfectly plain. Under its original charter the corporation had no express authorization to invest its funds in such stock, and even its incidental power, so called, to own such stock, when acquired in payment of a debt, was limited in respect of duration.

Under the law of March 24th, 1896, and the revised Insurance act of 1902, the Prudential company is permitted to purchase the stock of private corporations, like the Fidelity Trust Company, which have certain well-defined characteristics and for a certain well-defined purpose. In accordance with the well-settled principle heretofore referred to the Prudential company has no power to invest its funds in the stock of any private corporation which does not come within the statutory definition.

The complainants argue that the correct construction of the statutes above cited limits the Prudential company in purchasing private stock for investment to issues of such stock on which dividends have been regularly paid for five years prior to the purchase. It is insisted that this is the meaning of the statute; that otherwise a corporation which had paid dividends for five years upon a capital stock of $100,000 might issue $20,000,000 of new stock for patents or other property and embark in the wildest kind of speculative business, and yet all this new stock would come within the statutory definition.

I do not think that the construction thus contended for is consistent with the words employed in the law accepted in their ordinary meaning, nor is it required by what seems to me to be the spirit of the law. No rules can be laid down for investing money which will protect corporations against dishonest or negligent directors. After a corporation has paid dividends for five years, a change of its business, a change of the conditions under which it is operating, and particularly a change of the ownership of its stock and of the personnel of its board of directors, might make further investments in its stock, not only inadvisable, but grossly improvident. On the other hand, if the complainants'

contention is correct, after a large corporation has paid dividends for ten or twenty years; a natural and proper increase of its capital stock to a comparatively small extent, plainly advantageous to its business, and perhaps essential to the continuation of its prosperity, would take its entire outstanding stock out of the class of permissible investments to insurance companies, under this statute, even though the stock might stand in the market unimpaired as an investment security.

In my opinion we must take this statute just as it reads. The relative "which" relates to the nearest antecedent, which is the word "company," and not the word "stock." The company pays the dividends; the stock does not. If the company has been so well·managed and has been so successful that it has "regularly paid dividends for the five years preceding" the time when the purchase of stock is under consideration, the statute permits the directors of the Prudential company to make the purchase, or rather, to speak more accurately, the statute does not prohibit the purchase if the same, in all other respects, is a lawful act within the power of the board of directors.

The next question is whether the proposed acquisition of this new Fidelity stock would be a "purchase" of such stock within the meaning of the statute. In my opinion the word "purchase" is not used in the broad sense of the word "acquire," but in the more usual popular sense which makes it the correlative of the word "sell," which latter word is employed in the same sentence. Subscribing for new stock is a very different thing from buying or purchasing stock which has already been issued and is held against the corporation which issued it. Subscribing for an original issue of stock at the formation of a corporation, or for a new issue made by an existing corporation, is an act in the nature of a loan; it is a direct contribution of capital to a corporation. The distinction between subscribing for or taking new stock from a corporation and purchasing outstanding stock is analogous to the one so often drawn by the law between a loan of money to a party who gives therefor his promissory note with an endorser as security, and the purchase of precisely the same note after it has once been lawfully and honestly issued. Neither by the purchase of outstanding stock nor by the pur-

chase of outstanding promissory notes is the party obligor who issued the stock or notes directly affected.

That the statute is dealing exclusively with securities already "created" and in the hands of contemplated vendors or pledgors is further evinced by the fact that in one sentence the power is given "to lend on or purchase * * * the capital stock * * * or evidence of indebtedness created by any corporation." This language might be deemed to include loans made directly to the corporation on its promissory notes, were it not for the express proviso limiting all loans, except when made on national or state obligations, to an amount not exceeding ninety per cent. of the *market value* of the securities on which the loan is made. The statute is not providing for the investment of the funds of insurance companies, in the business of discounting the paper of corporations or of supplying corporations by loans or stock subscriptions, with additional capital. The safe and natural construction of this law, in my opinion, confines the investment of insurance funds, so far as they may be invested, in the stock and evidences of indebtedness of private corporations, to such stock or obligations as may be bought on the market and are commonly referred to as investment securities. These things exist as property in the hands of the vendors who hold them against the corporation which issued them. Stock which has once been issued and is in the market for sale generally has some sort of a market value—a value already placed upon it which is not necessarily measured by the amount which it originally represented as a contribution of capital to the corporation which issued it.

In the case of *Commercial Fire Insurance Co.* v. *Montgomery Co., 99 Ala. 1, 6, 7,* the word "purchase," in a similar statute defining the investment of funds of insurance companies, was held not to include a subscription to the stock of a corporation about to be formed.

In the case of *Rubino* v. *Pressed Steel Car Co.,* which was cited in the argument—a case decided by me some months ago, but not reported—the power of the corporation to contract for the acquisition of stock of another corporation to be formed rested upon an exceedingly broad certificate, which expressly

authorized the corporation to "acquire in any manner" the stock of other corporations.

If, however, the acquisition of this Fidelity stock by the Prudential company can be regarded as a purchase within the meaning of the statute, it is still, I think, subject to a fatal objection. It is not an *investment* of the capital, surplus or funds of the Prudential company in any correct sense of that term.

It must be conceded most amply that the honest judgment of the Prudential directors in regard to the safety and propriety of an investment of the moneys of the company in the capital stock of any private corporation cannot be reviewed by this court when the transaction is within the rule prescribed by the statute. The fact that the proposed investment is one of great magnitude, the further fact that the price to be paid for the stock is more than twice its intrinsic value, or what is called its book value, as distinguished from its market value, and the still further fact that the income to be derived from the investment, according to the present rate of dividends paid by the Fidelity company, is less than two per cent. per annum, may only be considered, I think, in determining whether in resolving upon this great expenditure of money these Prudential directors have actually undertaken to make an investment, or whether they have in fact undertaken to do something else either within or beyond their powers as directors.

The Prudential directors can derive no authority from any source except some statute binding upon the Prudential stockholders to expend $8,000,000 or $10,000,000 of the money of their corporation for the acquisition of this new stock of the Fidelity company. No incidental power so called to acquire stock can reach this case. There is no incidental power to invest in stock, because the power to invest in stock is expressly conferred and regulated. No other corporate object has been pointed out, in pursuit of which such an expenditure could be justified. The expenditure of this money, therefore, must be justified as an investment in stock in pursuance of the express statutory power or else it cannot be justified at all, no matter how beneficial to the Prudential company such an expenditure may be shown to be.

The affidavits in this case, and especially the affidavits of the directors of the Prudential company, prove to my mind beyond doubt that those directors have not resolved to expend these $8,-000,000 or $10,000,000 as an investment; that they have not adjudicated that this proposed acquisition of stock, considered by itself and independently of ulterior advantages to the Prudential company, is a proper *investment* of the capital, surplus or funds of the Prudential company. I do not doubt that among a number of separate investments which have received the approbation of the directors charged with the duty and power to invest, they may properly make a selection having in view other advantages which will flow from the investment to their company. But in every such case the expenditure must be an investment or else the directors are without power to make it.

If these directors had sworn that they considered the expenditure of this large sum of money a wise and safe investment of the funds of their company, without the slightest reference to the great scheme of "exchange of control," for the accomplishment of which this expenditure is a necessary act, an entirely different case would be presented. At most, these directors, in their affidavits, seek to justify the expenditure, apart from the great advantage to their company which they anticipate from their scheme, by calculating the unearned and extremely contingent profits which the Fidelity company, in their judgment, will make; it has enormously enlarged its business and made itself capable of financing operations very different from those which the company has conducted in its so far successful career.

In brief, I think that the affidavits show that the Prudential directors are plainly proposing to make this large expenditure of the funds of the Prudential company, not for the purpose of making an investment, but for the purpose, in the guise of an investment, of securing the carrying out of a certain scheme of corporate control, which they deem advantageous to their company.

Inasmuch as my conclusion is that the Prudential directors, without regard to the personal interest of half of them as stockholders and directors of the Fidelity company, have no power to expend the trust funds under their control for the acquisition

of this large block of new Fidelity stock, any further discussion of the subject would seem to be unnecessary. There were, however, several matters closely related to this branch of the case which were so elaborately argued on both sides that some reference to them seems necessary.

It was urged on behalf of the complainants that even if an investment in this new issue of stock should be deemed lawful, still such lawful investment must stop short of a controlling interest in the entire capital stock of the Fidelity company. If an investment in this stock is lawful, I am unable to see any distinction between an investment in forty-nine per cent. of the outstanding stock of the company and an investment in fifty-one per cent. of such stock. Of course, if the purpose of the purchase of stock is not to make an investment, but to control the company whose stock is purchased, then the purchase is not an investment at all. Individual investors and directors investing corporate funds, in my opinion, may wisely take into consideration the power which the proposed purchase will give to appoint directors who will manage the business of the corporation whose stock is made the subject of investment. The majority stockholder of a corporation does not manage the corporation, nor does he "go into the business" of the corporation. The directors of the corporation manage its business. *Gen. Corp. Act § 12; Plaquemines Tropical Fruit Co. v. Buck, 7 Dick. Ch. Rep. 219, 238; 2 Cook Corp. § 709.*

Authorities have been cited to support the proposition that an individual or a corporation holding a majority of the capital stock of another corporation sustains, by reason of such holding, a fiduciary relation to the minority stockholders, and therefore it is argued the acquisition of a majority of Fidelity stock by the Prudential company should be avoided. *Noyes Inter. Corp. Rel. § 300; Farmers Loan and Trust Co. v. New York and N. R. Co., 150 N. Y. 410; 7 Thomp. Corp. § 8223.* But these authorities only hold, in effect, that the fiduciary relation arises when the majority stockholder assumes control of the corporation and dictates the action of the directors. The majority stockholder is not made a trustee for the minority stockholders in any sense by the mere fact that he holds a majority of the stock, or by the

further fact that he uses the voting power of his stock to elect a board of directors for the corporation. The majority stockholder does not necessarily control the directors whom he appoints, and, in fact, he has no right to control them, and if they are controlled by him, they may be violating their duty, for which he also may be liable. The majority stockholder may use his voting power so as to constitute all the holders of the minority stock the entire board of directors. No liability of the majority stockholder to the minority stockholder for the misdeeds of his common trustees—the directors—can arise from the mere fact that the majority stockholder had the power to appoint, or, in fact, did appoint, these trustees. Such liability, however, may arise if the majority stockholder has made the derelict trustees his agents and dictated their conduct, and thus caused a breach of fiduciary duty, of which the minority stockholders complain.

The correct principle, in my judgment, is laid down by Judge Kirkpatrick in the case of *Windmuller* v. *Standard Distilling Co., 114 Fed. Rep. 491.*

In that case the majority stockholder was a corporation, which had guaranteed the dividends upon the stock of the other corporation, the majority of whose stock it held. The business of the latter corporation was prosperous, and its directors had been appointed by the majority stockholder. These directors, whose honesty was not impeached, passed the initial resolution for the dissolution of their corporation. The minority stockholders made no complaint—made no attack upon this apparently gross breach of fiduciary duty on the part of these directors. But these minority stockholders filed their bill against the majority stockholder to restrain it from voting at the subsequent stockholders' meeting, in accordance with its own selfish interest, for the dissolution of the corporation, which dissolution necessarily involved the discharge of its contract of guaranty. The court, it seems to me, strictly in accordance with the well-settled principles, held that the complainants had bought their stock subject to the laws of New Jersey, which permitted the directors of their company to institute the proceedings for dissolution and which allowed every stockholder to vote on this question in accordance with his own selfish interest. The injunction therefore was

denied, and it may be that a great wrong remained unredressed. If the complainants had attacked the action of the directors in instituting the proceedings for dissolution as the product of bribery, or improper influence of any kind, or of favoritism to the majority stockholder, who had appointed the directors, a very different case would have been presented. If the complainants had also charged that the directors—their trustees—had not only committed a gross and flagrant breach of duty, but that the majority stockholder had instigated them to do it, a strong case, apparently, would have been made out in which to hold the majority stockholder liable for damages.

The power to purchase stock as an investment necessarily involves the power not to manage, but to become interested in, the business of the corporation whose stock is bought. Every investor, whether an individual or a corporation, who buys one per cent. or ten per cent. or thirty per cent. of the outstanding stock of a corporation, has power to vote for the election of trustees, and, where the stock interest acquired is of a substantial amount, it frequently practically carries with it the nomination of one or more of the members of the board of directors.

If the purchase of this new Fidelity stock by the Prudential company were a permissible investment within the statute above cited, and if in fact in making such a purchase the directors of the Prudential company in good faith desired and intended to make an investment, as distinguished from the accomplishment of ulterior objects, including the control of the Fidelity company and the establishment of their great scheme for "exchange of control," then, in my opinion, the complainants in this case would have no well-founded objection to this purchase as a separate and independent act upon any of the other grounds above referred to.

If a corporation is authorized by its charter to acquire for investment of its funds any specified kinds of stocks of other corporations, I know of no limit which can be placed upon such acquisition other than that in every case there must be a *bona fide* investment. It may be conceded that the Prudential directors are not authorized by their organic law to pay out the

moneys entrusted to them for investment in the execution of schemes for "going into the banking business" or of controlling the action of the board of directors of a bank or railroad so as to make themselves in fact the managers of a bank or railroad. It may be, also, that in order to enforce the various considerations of public policy which have been presented on behalf of the complainants on this argument there is room for the legislature to wisely intervene and further regulate and restrict the powers of insurance companies to make investments in the stocks of private corporations or of certain classes of private corporations which sustain special relations to the public. But the legislature has not as yet seen fit to act. The legislature has seen fit to expressly authorize the Prudential directors to invest the funds entrusted to them for stockholders and policy-holders by purchasing stock of the Fidelity company. The lawful ownership of this stock as an investment carries with it all the incidents of such ownership which can be enjoyed by a corporation. All the more or less vague suggestions against the policy of permitting the Prudential directors to go into the business of managing a trust company or a bank which have been presented with ingenuity and force in this case, it seems to me, are sufficiently disposed of by the proposition that the acquisition of a majority of the stock of a corporation gives the holder thereof no right and imposes upon him no duty relating to the management of the business of the corporation, excepting such rights and duties as are involved in the honest selection of directors to act impartially for all the stockholders.

But the defendants claim that the whole force and effect of the statutes relating to the investment of the funds of the Prudential company which so far have been considered have been radically changed by the fifty-first section of the Corporation act as revised in 1896. This section provides that

"any corporation may purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of the shares of the capital stock of, or any bonds, securities or evidences of indebtedness created by any other corporation or corporations of this or any other state, and while owner of such stock may exercise all the rights, powers and privileges of ownership, including the right to vote thereon." .

The complainants insist that if this statute must be construed so as to make a radical change in the powers of the directors of the Prudential company to expend the enormous funds which they hold for the benefit of policy-holders and stockholders, it is unconstitutional, under a principle firmly established in this state. *Kean* v. *Johnson, 1 Stock. 401; Zabriskie* v. *Hackensack and New York Railroad Co., 3 C. E. Gr. 178; Schwarzwaelder* v. *German Mutual Fire Insurance Co., 14 Dick. Ch. Rep. 589.*

It is unnecessary to enter upon this constitutional question, because, in my opinion, the statute under consideration had no effect whatever upon special limitations contained in prior special charters and prior laws dealing with particular classes of corporations. The language of section 51 is merely permissive, and must be construed in connection with section 2 of the same statute, which provides that in addition to the

"powers specified in its charter or in the act or certificate under which it was incorporated, every corporation shall possess and exercise all the powers and privileges contained in this act, *so far as the same are necessary or convenient to the attainment of the objects set forth in such charter or certificates of incorporation.*"

Where the legislature has already defined, in a charter or law dealing with a special class of corporations, the precise extent to which a corporation shall exercise the power of purchasing the stock of other corporations for the "necessary or convenient" attainment of its objects, these general laws can have no application.

Where the legislature has specially regulated the exercise of the powers of a corporation by express provisions and express and implied limitations in its charter, subsequent general enactments cannot operate as a repealer under a well-settled rule. *State* v. *Minton, 3 Zab. 529; State* v. *Belvidere, 1 Dutch. 563, 564; State* v. *Mills, 5 Vr. 177, 180; Vail* v. *Easton and Amboy Railroad Co., 15 Vr. 237, 239; 4 Thomp. Corp.* § *5679.*

Although this principle has been applied generally so as to save a privilege contained in the prior special law, nevertheless it applies with equal force to cases like this where the legislature has imposed special limitations upon the investment of large sums of money in which large numbers of persons are interested.

Robotham *v.* Prudential Insurance Co.

If the view expressed above be not correct, then many provisions in the special charters of insurance companies and savings banks, and in the general laws regulating the organization and management of such corporations, safeguarding the investment of their funds for the benefit of policy-holders and depositors, must be deemed to have been swept away by this statute, which is in form merely a general enabling act. It would seem to follow that the express as well as the implied limitations upon the power of the Prudential directors to invest the funds of their company were repealed, and therefore these directors may now purchase for investment the stock of mining and manufacturing companies, and those highly speculative stocks known as "industrials." It would seem, also, to follow that the limitation to stocks on which dividends have been paid for five years must also have been repealed because the new statute permits the purchase of "stock created by any other corporation or corporations of this or any other state."

The history of the laws under consideration strongly indicates that section 51 of the General Corporation act was not intended to affect the express or implied limitations in charters like that of the Prudential company.

On March 24th, 1896, the legislature amended the Insurance act of 1875 so as to impose the limitations upon the investment of the funds of all insurance companies, whether "created by special charter or otherwise," which we are now considering. This law took effect immediately.

On April 21st, 1896, the same legislature passed the new Corporation act, which, in sections 2 and 51, above quoted, provided, in substance, that any corporation might purchase shares of stock and evidences of indebtedness of other corporations so far as such purchase should be "necessary or convenient to the attainment of the objects set forth" in the charter of the purchasing corporation. This law went into effect on July 4th, 1896, and, according to the contention of the defendants in this cause, operated as a repeal of the limitations upon the power of insurance companies to purchase the stock of other corporations contained in the law passed by the same legislature a few weeks

before. And yet the legislature, in 1902, as we have seen, substantially re-enacted all these limitations, embodying them in section 16 of a new act regulating "the incorporation of insurance companies and the transaction of insurance business in this state." This is the last expression of the will of the legislature upon the subject of the investment of the funds of insurance companies, and indicates that the continuous legislative policy has been to treat that subject in a distinct and special statute.

But it may be asked, what effect had section 51 in the way of giving power to corporations which, before its enactment, they did not possess? It is not necessary to answer this question, and the limits of this opinion will only permit a very brief and meagre discussion of it. I cannot, however, wholly dismiss the subject, because all through the argument for the defendants runs the more or less distinctly stated proposition that the statute of 1896 (section 51) arbitrarily extended the powers of all the corporations of the state in relation to the acquisition of stock in other corporations, and, *pro tanto,* repealed a large number of prior laws. The exact effect of section 51 is a point around which a large part of the argument in this case has revolved.

Section 51 may have been declaratory and its sole effect may have been to remove certain, perhaps vague, doubts as to the inherent capacity or incapacity of corporations to acquire and hold shares of stock of other corporations, even when such acquisition is made strictly in pursuance of the corporate objects.

Formerly corporations were incapable of voting upon stock of other corporations until proxies were provided for by statute. Corporations are now incapable of acting as directors of other corporations. But the power of a corporation at common law to acquire and hold stock in other corporations as property has been involved in doubt largely, I think, by the confusion so often made of an *ultra vires* act with an illegal act. *Bissell* v. *M. S., &c., R. R. Co., 22 N. Y. 258, 269; 2 Cook Corp. § 667 n; Bath Gas Light Co.* v. *Claffy, 151 N. Y. 24, 35.*

In former times, when the powers of corporations were defined in special charters or in narrow statutes which permitted the formation of corporations only for a few specified objects, the voluntary expenditure of corporate funds for the purchase of

shares of stock of another corporation would almost inevitably be a division of the corporate capital, and hence *ultra vires*. But when, in the honest pursuit of the corporate objects, the protection of the capital of the corporation, stock was taken for a debt, either directly from an insolvent debtor or by a judicial sale, no question was raised as to the capacity of the corporation either to acquire or hold such stock. There were no mortmain provisions of the common law applicable to corporate stock.

When corporations, under broad charters, had power to invest their funds as the directors might see fit, there was no legal prohibition upon investments in stock of other corporations. As soon as our General Corporation act was amended so as to permit the organization of corporations under it for "any lawful business whatever" (*P. L. of 1865 p. 913; Gen. Corp. Act of 1875 § 10*), it seems plain that corporations could be created for the express purpose of acquiring, holding and dealing in stocks to the extent that such business may be lawful. To construe the word "lawful" in such a statute as this in the sense of "authorized"—*i. e.,* not *ultra vires*—in accordance with a *dictum* in the case of *People* v. *Chicago Gas Trust Co., 130 Ill. 268, 811,* coverts the statutory definition of the lawful objects of corporations into a meaningless circle. In my opinion it is the very great enlargement of the scope of corporate objects, the wide extension of the purposes for which they may be formed, under our General Corporation act, and not the enabling act now embodied in section 51, which has extended the power of corporations created under our general act to acquire and hold stocks of other corporations.

It may be observed that the important word used in section 51 is not "acquire," but "purchase." If, therefore, this word "purchase" is to be construed in section 51 of the Corporation act as I have already construed it in section 16 of the General Insurance act, then it follows that even if section 51 were applicable to the investment of the funds of the Prudential Insurance Company in the stocks of private corporations, still that section would give no power to the Prudential company to subscribe for this new issue of Fidelity stock.

That section 51 had an important effect as an enabling and declaratory statute without making it operative as a practical re-

pealer of important sections of large numbers of charters of banks and insurance companies, and also of important sections of our general laws in relation to banking and insurance, and without making it operative to extend the objects and powers of corporations under their charters or certificates, will appear, I think, from an examination of the authorities in relation to the common law power of corporations to acquire shares of the capital stock of other corporations.

There is authority for the proposition that corporations are under do disability at common law to purchase and hold the stock of other corporations. *In re Barned's Banking Co., L. R. 3 Ch. App. 105, 113; Royal Bank of India's Case, L. R. 4 Ch. App. 252, 257; Booth v. Robinson, 55 Md. 419; Davis v. Electric Co., 77 Md. 35.*

There is also authority for the proposition that corporations cannot acquire and hold the stock of other corporations without express authorization under a statute, the origin of the prohibition, whether in the doctrine of *ultra vires* or in some positive rule of law based on public policy, being often left in uncertainty. See *Noyes Int. Corp. Rel.* §§ *264, 265; 1 Cook Corp.* § *315; 1 Thomp. Corp.* § *1102; 7 Thomp. Corp.* §§ *8353, 8354; 7 Am. & Eng. Encycl. L. 810; 816,* and cases cited.

There are also *dicta* at least sustaining the proposition that corporations are prohibited by a general rule of positive law based on public policy, entirely distinct from the doctrine of *ultra vires,* from purchasing stock in other corporations. *Oelbermann v. New York and Northern Railroad Co., 77 Hun 332, 335; Franklyn Bank v. Com. Bank, 36 Ohio 350; Franklyn Co. v. Lewiston Savings Bank, 68 Me. 43, 56.*

There is also authority for the proposition that a rule of law based on public policy, or on the doctrine of *ultra vires,* or on both, prohibits a corporation from acquiring the stock of another corporation where the business of one or both corporations has certain characteristics or where the purchase is made for certain purposes. *1 Cook Corp.* § *315; Louisville, &c., Railroad Co., v. Kentucky, 161 U. S. 677, 698; People v. Chicago Gas Trust Co., 130 Ill. 268.*

In this state of the authorities there was a wide and useful

Robotham *v.* Prudential Insurance Co.

scope for the operation of section 51 and the prior laws which it displaced without construing those laws as arbitrarily extending, or endeavoring to extend, the objects and powers of corporations organized under special charters or under the General Corporation act itself.

The legislation of New Jersey, which culminated in the enactment of sections 2 and 51 of the General Corporation act of 1896, certainly swept away all doubts about the capacity of corporations under any general rule of law recognized in the state to purchase and hold shares of stock of other corporations, and established the rule that all corporations may freely purchase and hold such shares so far as is "necessary and convenient to the attainment" of their corporate objects. But corporations can be formed under the act only for "lawful purposes," and, whatever may be inserted in their certificates, can be allowed to accomplish only lawful purposes. The question, therefore, remains whether, notwithstanding the capacity of corporations generally to hold stock of other corporations, there still remain prohibitions upon such corporate holding of stock applicable to particular cases in which the lawfulness of such holding by a natural person would be conceded. However this may be—whatever may be the precise effect of section 51 upon corporations formed before or after its enactment, under the general law of which it is a part—it is sufficient for all present purposes to reach the conclusion that this section has no effect upon the law which for years has been maintained for the special regulations of the investment of the funds of insurance companies, and which, six years after section 51 was passed, the legislature revised and re-enacted as a part of our insurance code.

2. We reach now the main question—whether the carrying out of this plan in its entirety would be a lawful exercise of power by the defendant Prudential directors, or whether it would be a violation of their fiduciary duty to all the stockholders of their company, and as such injurious to these complainants. The scheme is certainly a novel one in the State of New Jersey, and counsel for the defendants have failed to present a single reported case which indicates that such a scheme has ever heretofore anywhere been attempted.

Whether the board of directors of the Fidelity company are to appoint the directors for the Prudential company, who, in turn, will appoint, or reappoint, the directors of the Fidelity company, or whether the wheel shall be started revolving in the other direction, depends wholly upon which election of directors is held first after the scheme has been consummated. The plan, in the language of the president of the Prudential company, provides that the

"annual meetings of the two companies will be so arranged and other arrangements will be so made that the Prudential will forever be the dominant faction as, of course, it should be."

This language does not mean, and cannot mean, that the Prudential company, as an aggregation of stockholders, shall dominate the interlaced properties of these two large corporations. It does mean, and only can mean, that the directors of the Prudential company in office when the plan becomes operative, and those individuals whom they, from time to time, shall select and appoint to fill vacancies in their board, are to forever "dominate" the appointment of the directors of each corporation.

The question is whether the board of directors of the Prudential company, in the discharge of their duty as trustees for all the stockholders of the Prudential company, and in the honest pursuit of the objects of the corporation, can deliberately use their power, the power of the corporation and the funds of the corporation for the creation and perpetual maintenance of this scheme of corporate control. The elements of the scheme, the separate things which must be done in order to carry it out, may now be disregarded. It may be assumed that each separate act to be performed by the Prudential directors in carrying out their scheme may be *intra vires* when considered by itself alone, and also advantageous to the Prudential company. If the Prudential directors have not a right intentionally to carry out this scheme for exchange of control, then it would be their duty to avoid an accidental doing of the various things which, if all were done, would, as a natural result, bring the scheme into operation.

(1) The scheme, as a whole, is *ultra vires*. These directors of the Prudential company are placed in their position of power

in order that they may act as trustees for the stockholders and policy-holders of this great company in the management of its business—the legitimate pursuit of its corporate objects. This is precisely what they have been doing for many years, with conspicuous success. They have no right to use their powers as trustees to expend $8,000,000 or $10,000,000 of the funds which they hold in trust, and which they are charged with the duty of safely and profitably investing, in order to carry into effect a scheme for preventing real or imaginary evils resulting from the natural and direct operation of the laws of New Jersey in relation to their corporation. The defendants' affidavits refer to three methods established by law for the government of insurance companies—one by stockholders, another by policy-holders on the mutual plan, and a third by a combination of these two methods. These affidavits further show that the principal stockholders of the Prudential company—presumably including the defendants, who appear as directors also of the Prudential company—"set about the consideration of some plan" for safeguarding the interests of the policy-holders against the "depredations" which might be possible in case in the future the stockholders of the company should exercise their undisputed legal right to control the company and elect trustees to manage the same who would be acceptable to them. It may well be doubted whether these gentlemen, with all their experience and skill, would not do better to let the laws of New Jersey have their natural effect, while they confine their activities to the performance of the duties of their office, which they have demonstrated they know how to perform most efficiently. They were not elected to revise the laws of New Jersey, or to devise schemes for evading those laws or improving their practical effect upon the policy-holders or stockholders. It must be fully conceded that the stockholders may plan schemes for lodging the governing power of the corporation "beyond the reach of reckless speculators," who are liable to rush in with immense sums of borrowed money and obtain control. How such schemes would stand the legal tests which might be put to them is entirely beyond our present inquiry. The point is that, while the stockholders can spend their time and money in devising such schemes and putting them into

effect, these directors have no right to use their fiduciary power—to use $8,000,000 or $10,000,000 of trust money placed in their hands for investment—for the purpose of exploiting any such schemes. A single stockholder has a right to call a halt. The act or combination of acts is *ultra vires,* because it is made so by the confessed purpose—the intention and object with which it is to be performed. It is well settled that an act may be *intra vires* or *ultra vires,* according to the purpose which the directors have in view in doing it. The expenditure of the money of a corporation by its directors is, *per se,* often a neutral act; whether such expenditure is *intra vires* or *ultra vires* must, in large numbers of instances, depend upon the purpose—the actual honest purpose—which the directors have in view. *1 Morawetz Priv. Corp. § 362; Elkias v. Camden, &c., Railroad Co., 9 Stew. Eq. 241, 242; Ellerman v. Chicago Junction Railroad Co., 4 Dick. Ch. Rep. 217, 232, 242, 243; Wildes v. Rural Homestead Co., 8 Dick. Ch. Rep. 425; S. C. on appeal, 9 Dick. Ch. Rep. 668.* The reversal of the case last cited, on the facts, did not affect the equitable principles laid down by the chancellor. In this case, as we have seen, there is no *bona fide* independent purpose to make an investment by expending these $8,000,000 or $10,000,000; the actual object of the expenditure is to accomplish something which is entirely foreign to the duties of these directors.

(2) The establishment of the proposed syndicate for perpetual control would be not only *ultra vires* of the corporation and its directors, but also a direct intentional injury to the complainants and other dissenting stockholders.

A series of cases in this court and in the court of errors and appeals, commonly referred to as the "voting trust" cases, has established the principle that "every stockholder is entitled to the benefit of the judgment of every other stockholder in the management of the affairs of the corporation," and that agreements which sever the beneficial interest in stock from its voting power are in many instances a violation of this right which courts of equity will prevent by an injunction. *Cone v. Russell, 3 Dick. Ch. Rep. 208; White v. Inflatable Tire Co., 7 Dick. Ch. Rep. 178; Clowes v. Miller, 15 Dick. Ch. Rep. 179; Kreissl v.*

*Distilling Co., 16 Dick. Ch. Rep. 5; Chapman* v. *Bates, 16 Dick. Ch. Rep. 667.*

The minority stockholder takes great risks. His one unfailing assurance lies in the fact that every other stockholder presumably has a money interest in the corporation which his self-interest will lead him to protect. This assurance remains, although portions of the stock may be vested in a trustee whose undivided duty it is to hold it and vote upon it for the benefit of his *cestui que trust.* Every stockholder, also, may have outside interests which are hostile to those of the corporation. Every stockholder is no doubt exposed at times to danger from these hostile interests of his associates, as is illustrated in the case of *Windmuller* v. *Standard Distilling Co., supra.* When, however, the government of the corporation—the absolute control of its policy, the conduct of its business and the expenditure of its moneys are not only dissociated from the beneficial ownership of a large majority of the stock, but even lodged permanently in a self-perpetuating syndicate whose members may own only one share of stock each, and whose power, therefore, does not come from the property which they control, the minority stockholder's one safeguard seems to have disappeared. I am not undertaking to anticipate any definition which yet may be made of any duty which every stockholder may owe to all his associates in using the voting power of his stock. The majority stockholder certainly has no right to appoint "dummies" as directors; it would seem that he must therefore owe a duty to all his fellow stockholders to use his power of appointing directors honestly—to use this power with an honest intent to secure directors who will act for the equal and common benefit of all the stockholders. But what is particularly pointed out here is the established principle that each stockholder's rights are safeguarded by the fact that the control of the corporation is placed in the hands of trustees who are chosen by persons who own beneficially a large part of all the property which the corporation owns or who at least have a right to a large part of the profits which the stockholders have a right to divide.

That the severance of beneficial interest from the voting power of the Prudential stock under this proposed scheme is a violation

of the principle above mentioned, and an injury to every dissenting stockholder of either of the two companies seems to me to be manifest. As will appear more fully hereafter, the proposed exchange of majority holdings of stock by these two corporations is in effect a retirement of a large part of the combined capital. When the scheme is effected, the remaining stockholders of the Prudential company are legal stockholders in their own company, and in equity are stockholders of the Fidelity company, and the converse of this proposition is true of the Fidelity stockholders. In using this language, corporate existence is disregarded as a mere fiction. In fact we have the management of the property and business of the remaining stockholders perpetually vested in the self-perpetuating syndicate. This syndicate might be composed of two dozen men each holding a single share of stock.

No voting trust case has been cited which presents a more flagrant violation of the right which, under various limitations, is accorded to the stockholder of having the business of his corporation controlled by the pecuniary interest which is at stake.

But the proposed scheme causes a further direct injury to the dissenting stockholders by stripping from their stock an element of pecuniary value to which, under the laws of New Jersey, they are entitled. The president of the Prudential company, in his affidavit, refers to the small capital stock ($100,000) which controls the Equitable Life Assurance Society of New York. The affidavit states that dividends have never been paid beyond seven per cent. per annum; and the fact, I believe, is that the dividends are absolutely limited to that rate by the charter of the company, and yet this affidavit, as an illustration of the fact "that the amount of dividends present or expected upon a stock is only one element in the ascertainment of its real value," informs us that this Equitable stock is "quoted at $1,500 per share on the market." What gives the Equitable stock a market value which makes the absolutely fixed dividends yield only a fraction of one per cent. per annum upon the market price? Is not the reason widely known? Is it not because of the enormous power which the possession and control of the hundreds of millions of assets of the Equitable company lodge permanently in this

stock? It is true that the Prudential stock is more widely scattered, as the president's affidavit shows, but nevertheless its effective voting power is an element of money value, and it is of this valuable thing that the defendant directors propose by their scheme to despoil their beneficiaries and appropriate to themselves. Conceding that stockholders may devise such schemes and use their own money and power as stockholders to carry them out, can there be any question that these trustees have no right to use the power placed in their hands by the stockholders to carry out such a scheme and effect such spoliation? Of course I am assuming that, stripping the complainants' stock of all value derived from its voting power—its effective voting power—will, notwithstanding the affidavits of the various Newark brokers and others, tend to injure the market value of that stock. If, however, this conclusion of fact may be called in question, it is enough, for the purposes of this case, to say that these complainants are not willing to exchange the pecuniary value belonging to their stock and resulting from the lodgment of voting power in the actual and equitable stockholders for a share of the estimated benefits of this scheme, which they have rejected and desire to defeat.

In an ingenious and able brief, presented on behalf of these defendants, the following statement is made of a situation claimed now to be legally possible and unassailable under the laws of New Jersey:

"One man controls a company of $10,000,000 capital. He may form a new company with a capital of $5,100,000 to hold a majority of the stock. He may then sell all but $2,600,000 of the stock to company No. 2 and transfer his remaining stock to a new company with a capital of $2,600,000. He may then sell to company No. 3 all but $1,400,000 and transfer that to a new company. This process may go on until the power of the whole chain of corporations is vested in the holder of a few thousand dollars of stock in the ultimate company, and the same chain can be used for an unlimited number of companies."

The brief concludes that "the check on the process is not in the law, but in the difficulty of unloading the minority shares of each company."

There seems to be grounds for the opinion that the unfortunate

holders of $4,900,000 of the capital of the original company, full, legal and equitable stockholders, have certain sharp and sudden "checks" which they can put to such a financial operation as is intended to be presented in this supposed case. This startling proposition suggests a variety of interesting questions, which need not be discussed at length in this case (for a reason which will be stated hereafter), such as the following:

*First.* Whether the holders of the $4,900,000 of stock could not disfranchise the few irresponsible adventurers who assumed to wield the voting power of the $5,100,000 of stock—disfranchise this stock until the beneficial owners of it should take control of their own property and use its voting power.

*Second.* Whether the actual, beneficial owners of the $5,100,000 of stock could not break through the chain of corporate fictions which separated them from their property and dictate how its voting power should be exercised.

*Third.* Whether it would not be the duty of the attorney-general of the state to take proceedings to dissolve the holding companies as an abuse of corporate franchises, as a fraud upon the extremely liberal provisions of our Corporation act, which, however, permit the incorporation of companies only for a *"lawful purpose."*

But none of these questions need be considered to meet the full force of the illustration so confidently advanced. In the case put, if the holders of the $4,900,000 of stock are injured by the scheme, such injury has been effected by the voluntary conduct of their associate stockholders in the use of their own property, whereas in the present case before this court the injurious condition is brought about by these defendant directors in the exercise of the powers and in the expenditure of the moneys which they hold in trust for the complainants.

An illustration suggested to counsel for the defendants at the argument was as follows:

Suppose ten corporations, each with the capacity to buy stock, be ranged in line. The first acquires a majority of the stock of the second, the second of the third, the third of the fourth, and so on to the end of the line. Last of all the tenth corporation acquires a majority of the stock of the first. This is only an

expansion of the theory upon which the defendants in this case have constructed their scheme. To heighten the color of the picture, without affecting its legal aspects, it may be supposed that the perpetual syndicate who control the ten corporations sell all their stock but the necessary qualifying shares.

Counsel for the defendants, with great courage and frankness, declared that the actual equitable owners of every dollar of the capital of these ten corporations, excepting the insignificant amount represented by the qualifying shares of the syndicate, would be powerless, under the laws of New Jersey, to get at their property or in any way control its administration. And all this most amazing result is reached by construing the enabling act, comprising section 51 of our General Corporation law, as establishing an absolute and arbitrary right in all corporations to purchase and hold stock in other corporations and vote thereon, together with the rigid maintenance of the pure fiction of corporate existence, so as to make these fictitious creatures the actual owners of the stock which, in equity, belongs to their stockholders. I think I have sufficiently indicated the legal and equitable principles which would be applied by the court to the prevention and cure of the evils which would result from such an extraordinary financial scheme.

I may say here, although perhaps the view has been sufficiently indicated already, that it may well be questioned whether the scheme of these defendants could ever be carried out so as to secure the supposed beneficial results which they have in view.

The whole plan is based on the theory that the fiction of the existence of these two corporations as entities would be maintained by the courts so as to exclude the equitable owners of the property of these corporations from its possession and control.

Where each of two corporations, each having $1,000,000 of capital, acquires a majority of the stock of the other, what takes place, as I have said before, is, in effect, a retirement of a majority of the aggregate stock. Assuming that the selling stockholders have been paid the actual value, or book value, of their holdings, then the combined capital and surplus of the two corporations have been diminished by the loss of the greater part thereof, say fifty-one per cent., which the selling stockholders

Robotham *v.* Prudential Insurance Co.

have carried off in their pockets. The two corporations continue to do their business with forty-nine per cent. of the original aggregate capital and surplus, and this capital and surplus is owned by the remaining stockholders of the two corporations, respectively. Each set of stockholders now own, in equity, a little less than a quarter of the original capital and surplus of their own corporation and a little more than a quarter of the original capital and surplus of the other corporation. Keeping alive fifty-one per cent. of practically retired stock of each corporation, as something owned by the other corporation, in each case as a fictitious person, is necessary for the purposes of book-keeping and for the equitable distribution of profits and finally of capital. If the cross-purchases of stock between the two corporations continued indefinitely, the final result would be the distribution of the entire capital and surplus of each corporation, except what belonged to the qualifying shares of the directors. The result would be the same if each corporation paid out its capital and surplus for the retirement of all its own stock, except such qualifying shares. If more than the actual or book value, say double that value, were paid to the selling stockholders, the distribution of the entire combined capital and surplus would be completely effected when half of each capital stock had been exchanged, and the remaining half of the stock would be based upon expectations and sentimental values, which would have to be deemed transferred from the market to the respective treasuries of the companies.

Without undertaking to discuss further the interesting legal questions to which such cross-purchases of stock may hereafter give rise, I desire merely to point out that, under general principles which already have been established in our courts of equity, the scheme which these ingenious men have proposed for excluding the beneficial owners of the stock of the Prudential company from the management of its affairs might, after all, prove abortive if now or at a later stage of its development it should be put to the test. The whole scheme is built upon fictions, which our law maintains as necessary and valuable for many purposes, but which equity nowadays frequently casts aside for the prevention of fraud and the accomplishment of justice.

It is true that in every case where one corporation acquires a majority of the stock of another corporation the board of directors of the latter may be chosen, not by a majority, but by a minority of all the persons beneficial interested in its stock. But in every such case at least a majority of a majority in interest ultimately controls the election of directors, nor does the situation involve a self-perpetuating syndicate not necessarily based on a substantial interest in the properties which it controls. Where one corporation holds the majority of the stock of another the directors of the former, in order to continue themselves or their appointees in office as directors of the latter, must own a majority of the stock of their own company, and consequently be the beneficial owners of at least a majority of a majority of the stock of the other company.

The fact that this proposed scheme might, or would be, abortive, is no reason for withholding an injunction on behalf of these complaining stockholders. They are not deprived of the right to bring an equity suit to prevent an injury to their property because, in case the injury were accomplished, they could maintain an equity suit for redress.

(3) It is impossible, within the reasonable limits of this opinion, to discuss the question of the disqualification of these directors by reason of their self-interest in its application to their scheme as a whole and to each of its constituent parts.

The most serious question of this kind relating to the separate parts of the scheme is raised by the fact that the Prudential directors are proposing to add $8,000,000 or $10,000,000 to the capital of the Fidelity company by a subscription for new stock, although one-half of the entire Prudential board are directors of the Fidelity company and consequently stockholders of that company. I prefer to avoid the discussion of this question of disqualification in its relation to any of the details of this scheme as independent transactions. Upon the argument, as I understood the statements of counsel for complainants, they admitted most amply that, as a matter of fact, these Prudential directors are not actuated by a selfish desire to sell a portion of their holdings of Prudential stock to the Fidelity company in order to receive therefor a sum of money coming from funds in a large

part contributed by the Prudential company under their control and direction; nor are they in fact supplying to the Fidelity company this large increase of capital from the funds of the Prudential company in order to benefit the former company at the expense of the latter.

But the question of the capacity or incapacity of this particular board of Prudential directors to adjudicate upon the advisability of this proposed scheme as a whole is a very different matter, and one which alone, in my opinion, would control the decision of this motion. This is the last question which I shall undertake to discuss.

How far self-interest of a director in opposition to the interest of his corporation disqualifies him from acting as a director or exposes corporate action to injunction at the arbitrary election of a dissenting stockholder, or exposes such action to review by the courts at the instance of such stockholder, are matters about which the authorities are not entirely in accord. *2 Cook Corp. (4th ed.)* § *658; 3 Thomp. Corp.* §§ *4059, 4063, 5650; 7 Thomp. Corp.* § *8502; Stewart* v. *Lehigh Valley Railroad Co., 9 Vr. 505, 522; Met. Tel. Co.* v. *Dom. Tel. Co., 17 Stew. Eq. 568, 573.*

On the one hand it may be urged with great force that a minority stockholder has a right to repose upon impartial, unbiased action on the part of the directors, who are his trustees, and that he ought not to be obliged, where directors have been acting on both sides of a transaction, or are proposing so to act, to come into court with proofs of actual injury to himself or to the corporation. On the other hand, theoretical rules have to give way to the practical necessities of business. Business eventually is not extended, and great departments of human activity are not developed by means which are fraudulent. The use of such means in the end is suicidal. In these days the relations of corporations to each other are exceedingly complex. Common directors abound and common directors are better than "dummies." Whether a transaction between two corporations has been accomplished or remains executory, I incline strongly to believe that the safe rule in most cases in the end will be found to be that the presence of a director or directors on both

sides of the transaction under investigation does not give the dissenting stockholders an arbitrary right to an injunction, but may give him a most ample right to subject the transaction to the security of the court, and may cast upon the corporations or directors concerned the burden of disclosing and justifying the transaction.

To give the dissenting stockholder the arbitrary right to an injunction in this class of cases often will put a deadly weapon in the hands of the blackmailer and the corporation "striker." Such a rule tends to drive the actual wrongdoers to cover, to induce them to seek concealment, while the corporate action is accomplished through apparently impartial directors, who are, in fact, only agents or "dummies." In several recent cases before this court, where the existence of common directors was relied on for injunctive relief, these common directors, while the motion was pending, were made to disappear, and apparently impartial directors took their place, who proceeded solemnly to approve of the action of the old boards which the injunction was designed to restrain.

The fiction of corporate existence goes down in many cases before a charge of fraud, but I incline to think that this fiction, in most cases belonging to the class under consideration, should be rigidly maintained to defeat a mere arbitrary demand on the part of a stockholder that a corporate transaction should be enjoined even though all the impartial directors of the corporation and nine-tenths of the stockholders come into court with a demonstration that the transaction was advantageous in all respects to their corporation, and that an injunction upon it would cause great loss.

But whether in this case dissenting stockholders can arbitrarily prevent corporate action on the ground of the presence of directors, or a majority of directors having a hostile interest, I do not intend to consider. I propose to apply, not to the details of this scheme, but to the scheme as a whole, what certainly is a safe rule, viz., that where *all* the directors of a corporation have a direct valuable interest in the action which they propose to take, in which interest their stockholders do not participate, these stockholders may compel them, before they will be allowed

to carry out their scheme, to prove before the court that it is advantageous to the corporation.

It seems to me that the disqualification of these fourteen directors to adjudicate finally that their scheme for exchange of control is advantageous to the Prudential company is clear and absolute.

That the proposed scheme, if carried into effect, will directly and necessarily benefit these fourteen directors, and secure to them great emoluments and great influence and power, seems to be a fact beyond dispute. The salaries and other advantages controlled by the directors of an insurance company holding to-day nearly $60,000,000 of assets and contemplating, in the near future, the possession of $100,000,000, or even $200,000,000, of assets, constitute a personal prize of very great magnitude.

It is not an answer to this proposition to say that these directors already hold this prize in their possession. They do not hold it in perpetuity for themselves and those successors whom they will personally select, from time to time, as death makes vacancies in their board. The effect of the scheme is to prevent them and their chosen successors from losing the prize after they have ceased to own beneficially the majority interest in the stock which now keeps the prize in their possession.

These fourteen directors have never made an independent and unselfish adjudication that this scheme will be beneficial to the Prudential company. They do not exclude themselves from the charmed circle which their scheme contemplates; they propose to sit therein, to the exclusion of the other stockholders. That this is their plan is evident, and is not denied. The Prudential directors are to "dominate," and if any change in the membership of the Prudential board were contemplated before the scheme is to go into effect the defendants ought to have proved, and could easily have proved, such fact. If these directors had merely feared that in the future a combination of a majority of stockholders owning $8,000,000 or $10,000,000 worth of Prudential stock might commit a "depredation" not merely upon the salaries and perquisites of the managers of the company, but upon the assets of the company which belong to its policy-holders and stockholders, they could easily have arranged their scheme so that in effecting its adoption they would

be free from any disqualification arising from selfish interests. If, for instance, they had planned to select fourteen men of high character and standing in the business world, and then to see that each of these men was duly qualified with at least one share of Prudential stock to act as a director, and then to make these fourteen independent men the personal syndicate for perpetual control, while they themselves unselfishly retired forever from the scene of their labors and the possession of their emoluments as managers, they would then have presented a scheme which would not be open to the particular objection now under consideration. They have not done this, nor have they apparently considered such a possible situation, much less given it their approval as directors.

Applying to the situation the very moderate and safe rule above mentioned, the result is that the favorable judgment of these fourteen directors, when challenged by a dissenting stockholder, is to be practically excluded from consideration, and the burden is placed upon these directors of making full disclosure of their scheme to the court and of presenting clear and satisfactory proof that it will in fact be advantageous to the Prudential company. In the absence of such proof the scheme cannot receive the commendation of a court of equity, and, as it has not received the commendation of an impartial board of directors, it must be interdicted.

Could a single equity, or even a bench of such judges, unaided by experience in the management of insurance companies, and unaided by the favorable judgment of a board of insurance managers and experts qualified to express an impartial opinion, find in the evidence so far produced in this case safe grounds for the affirmative conclusion that this startling novelty in corporation law and corporation business is a safe and prudent thing for the Prudential Insurance Company to adopt and establish? I think not; and on this ground alone, in my opinion, an injunction should go.

I do not wish to be misunderstood upon this point. The situation in which the court is asked to give its approval to this novel scheme must be kept distinctly in view. A court of equity, if it had the power to review the honest acts of the Prudential direc-

tors within the scope of their powers, which it has not, might well, in any case, repose upon the deliberate judgment of these directors, sanctioning any scheme as beneficial to their company in view of their commanding position as expert insurance managers and their conceded freedom from any intention to violate their fiduciary duty. But the difficulty is that under the rule above defined and applied to this situation, the official judgment of these directors cannot be resorted to in order to aid the judgment of the court. Their testimony as individuals, of course, can be accepted for what it may be worth. It is from all the testimony in the cause on both sides that this court is asked to find affirmatively that the establishment and maintenance of their self-perpetuating syndicate for the perpetual control of the Prudential Insurance Company will be advantageous at least to the stockholders of that company, including the complainants.

The evidence produced on this motion bearing upon the sharp question whether the establishment of this novel and ingenious scheme for the control of a great insurance company, with $60,-000,000 of assets—a scheme which has not been intentionally created by the insurance statutes of the state—would be wise, safe and advantageous to the Prudential Insurance Company is extremely meagre. This evidence, in my opinion, not only fails to justify a judgment' of this court in approval of the scheme, but raises the gravest apprehensions that the scheme, if carried out, would be a continuous menace to the policy-holders and the stockholders of the Prudential company, which would grow more and more portentous as the years go by and these faithful and experienced men one by one vacate their seats of power and give place to other men who are now unknown; that after all, or almost all, of the present board of directors have passed away, and the majority of the board has undergone several changes, this scheme might even destroy this great insurance company, which these present directors have created and which now stands as a monument to their integrity, wisdom and skill.

My conclusion upon the whole case presented on this motion is that the Prudential company and its directors should be enjoined from subscribing for the new issue of Fidelity stock as a specific act which, without reference to its connection with the

scheme for exchange of control, is unauthorized by the laws which define the manner in which the funds of the Prudential company are to be invested. The Prudential directors should also be enjoined from doing any act, in the exercise of their power as directors, with intent or with the effect to carry out the scheme of lodging perpetual control of the two companies in the directors of either or both of the companies. The injunction will not interfere with the power of these directors to cause the vote of the Prudential company upon its stock in the Fidelity company to be cast in favor of increasing the capital stock of the latter company, either at the present time or at any time hereafter, when, independently of the scheme which this court has condemned, they may impartially adjudge such increase to be beneficial to the Prudential company as a stockholder of the Fidelity company, provided the effect of such increase as a separate act or in connection with other acts, facts or conditions, will not result in or be the means of creating the combination of conditions under which the above-mentioned scheme may go into effect. In dealing with any and all separate lawful acts within their power and within the power of their corporation, these directors must see to it that they do not, by such acts as they may separately consider advantageous to their corporation, establish the condition of corporate control which this court has found to be injurious to the complainants and the other stockholders of the Prudential company.